# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **FIRMA HELGET,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | |
| ) | **No. 13-2228-KHV** |
| ) | |
| **CITY OF HAYS, KANSAS , et al.,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
|  ) | |

## MEMORANDUM AND ORDER

Plaintiff Firma Helget brings suit against her former employer, the City of Hays, Kansas and Hays Police Chief Donald Scheibler and City Manager Toby Dougherty.  Under 42 U.S.C. § 1983, plaintiff claims that defendants terminated her employment in retaliation for exercising her First Amendment right to testify truthfully (Count I) and to speak out on a matter of public concern (Count II), and for conspiring to violate her First Amendment rights (Count III).  Plaintiff also brings state law claims under Kansas common law for terminating her employment for giving truthful testimony and for speaking out on a matter of public concern.  This matter comes before the Court on the Individual Defendants' Motion For Summary Judgment (Doc. #178), Defendant City Of Hays, Kansas' Motion For Summary Judgment (Doc. #185) and Plaintiff's Motion For Partial Summary Judgment (Doc. #181), all filed October 27, 2014.  For reasons stated below, the Court finds that defendants' motions should be sustained in part and that plaintiff's motion should be overruled.

**Standards**

**Summary Judgment**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A "genuine" factual dispute is one "on which the jury could reasonably find for the plaintiff," and requires more than a mere scintilla of evidence.  Liberty Lobby, 477 U.S. at 252.  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Id. at 248.

The moving party bears the initial burden of showing that there are no genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1085 (10th Cir. 2008).  Once the moving party meets the initial burden, the burden shifts to the nonmoving party to show that a genuine issue remains for trial with respect to the dispositive matters for which the nonmoving party carries the burden of proof.  Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 739 (10th Cir. 2004); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  As to these matters, the nonmoving party may not rest on the pleadings but must set forth specific facts.  Fed. R. Civ. P. 56(e)(2); Matsushita, 475 U.S. at 586-87; Justice, 527 F.3d at 1085.  Conclusory allegations not supported by evidence are insufficient to establish a genuine issue of material fact.  Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007); see Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996).

When applying this standard, the Court must view the factual record in the light most favorable to the party opposing the motion for summary judgment.  Duvall v. Ga.-Pac. Consumer

-2-

Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010); see Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250-51.  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

### Qualified Immunity

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity provides government officials immunity from suit as well as from liability for their discretionary acts.  See Mitchell v. Forsyth, 472 U.S. 511, 526-27 (1985). The doctrine of qualified immunity serves the goals of protecting officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.  Butz v. Economou, 438 U.S. 478, 506 (1978).

When defendant asserts a qualified immunity defense at the summary judgment stage, the burden shifts to plaintiff to show that defendant violated a constitutional right and that the constitutional right was clearly established at the time of the alleged violation.  Vondrak v. City of Las Cruces, 535 F.3d 1198, 1204 (10th Cir. 2008).  To satisfy this burden, plaintiff must show facts which, when viewed in the light most favorable to plaintiff, demonstrate that (1) defendant's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged violation.  See Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  If plaintiff does so, the burden shifts back to defendant to prove that no genuine issues of material fact exist and that defendant is entitled to judgment as a matter

of law.  See Olsen, 312 F.3d at 1312.  If the record shows an unresolved issue of fact relevant to the

qualified immunity analysis, the Court must deny the motion for summary judgment.  See id.

### Facts

The following material facts are either uncontroverted, or, where controverted, set forth

alternatively in the light most favorable to each party.[1]

From 1989 to 2012, Firma Helget worked as an administrative secretary for the City of Hays,

Kansas.[2]  Beginning in 2012, Helget served as administrative secretary for Chief of Police Donald

Scheibler and Assistant Chief of Police Brian Dawson.[3]  The City of Hays maintains two job

descriptions for the position of administrative secretary.  The descriptions are similar; each lists

tasks which include preparing agendas and taking minutes for meetings, budget-related tasks and

maintaining personnel files.  See Docs. #186-8, 182-28.  One of the descriptions states that "[t]his

employee should possess . . . the ability to maintain confidentiality" and that the essential functions

include "maintain[ing] confidential records and files."  See Doc. #186-8.  Plaintiff knew that her job

required her to maintain confidentiality.  Helget Dep. at 167, 138.

The City Personnel Manual provides that "disclosing confidential records or information

unless directed to do so by a department head or supervisor" is cause for termination.  Ex. H,

CITY000884-85.  The Manual also provides that "[u]nauthorized use of City time or equipment"

is misconduct that is subject to disciplinary action.  Ex. H, CITY000881-82.  Plaintiff understood

---

[1]    Each parties' statement of facts includes commentary and argument and some facts
do not contain any citation to the record.  The Court does not consider facts which are not properly
supported under D. Kan. Rule 56.1.

[2]    The City of Hays, Kansas, is a municipal corporation organized under the laws of
the State of Kansas.

[3]    Plaintiff was an employee at will.

that she was responsible for reading and complying with the policies in the Manual.

On November 16, 2011, former Hays Police Department Officer Blaine Dryden filed a lawsuit in this Court against the City of Hays, City Manager Toby Dougherty and then-Chief of Police James Braun.  See Case No. 11-CV-1354-KHV-KGS, Dryden v. City of Hays, et al.  Under 42 U.S.C. § 1983, Dryden claimed that defendants had fired him in retaliation for union activities.  His complaint alleged that in early December of 2010, the City had decided not to replace his worn-out ballistics vest.  This allegation was relevant because the City claimed that it fired him for an incident which occurred in late December of 2010.  Thus, the fact that the City decided in early December not to replace Dryden's ballistics vest supported his claim that the City's stated reason for firing him was a pretext.

Some time during 2011, Dryden's attorney, Denise Howard, contacted Helget regarding Dryden's lawsuit.  In April of 2012, Howard spoke with plaintiff again.  On April 22, 2012, plaintiff voluntarily executed an affidavit for Dryden's lawsuit against the City.  The affidavit stated in relevant part as follows:

> During the entirety of James Braun's tenure as Chief of Police, I was employed as the administrative secretary to the Chief and Assistant Chief of Police.
>
> In November 2010 I was told to prepare a list of every officer [ ] due for a new ballistic vest in 2011.  Pursuant to that request, I prepared a list which included Investigator Blaine Dryden.
>
> When I presented the list to [A]ssistant Police Chief [Philip Hartzfield], he told me that the Department was going to hold off on ordering a vest for Blaine Dryden.
>
> No other officer's name was removed from this list.
>
> On December 6, 2010, I ordered new ballistic vests for every officer on the list except for Blaine Dryden.
>
> Blaine Dryden was known by me and others in the Department to be an

active member of the F.O.P. who would advocate on behalf of officers and other employees of the Department.

While pursuing my own grievance against the Department, Police Chief James Braun cautioned me about talking with Blaine Dryden.

During James Braun's tenure as Chief of Police, it was common for people to talk about how much longer they had to work before they could retire. In addition to Blaine Dryden, I heard Sergeant Dan Koerner and Investigator Bill Lovewell make such statements.

Doc. #186-7 (paragraph numbers omitted).  Helget did not know why Assistant Police Chief Hartzfield told her to hold off on ordering Dryden's vest. Ex. C. at 139, 140, 156.  She later testified that she believed that the affidavit revealed wrongdoing because in all of her years at the Police Department, she had never had an officer removed from the vest replacement list. Id. at 176.

Helget obtained the information in the Dryden affidavit solely through her employment with the City.  Ex. C, Helget Dep. at 139-40.  Plaintiff did not consult with anyone at the City before offering the information contained in the affidavit.[4]

On April 27, 2012, Dryden filed plaintiff's affidavit as an exhibit in support of his response to the City's motion for summary judgment in his case.

On May 1, 2012, Scheibler and Dawson met with Helget to discuss her job performance. They counseled Helget about personal internet use at work and her overall demeanor.  Doc. #182-2.[5] During that meeting, Scheibler was not planning to fire Helget – rather, he said "there's going to be some documentation coming out of this and we're going to have to sit down and take a look through

---

[4]     Plaintiff did not tell her employer, or anyone at the City of Hays, that she had spoken with Howard.  Id. at 92.

[5]     On April 25, 2012, before Scheibler and Dawson had learned of the affidavit, they gave  Helget a card which said "thank you for all you do," along with a $30 gift card to "Gutch's Bar and Grill," in celebration of Administrative Secretary's Day.

that." Id.  Scheibler also told Helget that she was a "super" purchasing agent.  Id.  During spring

of 2012, Dawson had been monitoring Helget's demeanor because of concerns about her interaction

with staff.  After the meeting on May 1, he did not record any observation about her being rude.  On

May 2, 2012,  Dawson took note of plaintiff's "efforts to be more social."  Id.

On May 9, 2012, Helget told Scheibler she was "considering" a job with Fort Hays State

University ("FHSU").  Scheibler responded that he "appreciate[d]" the advance notice that Helget

was considering the job because "you do a lot."  Ex. B.  Helget told him that she would not know

for sure about the job with FHSU until July of 2012.

Scheibler testified that on May 10, 2012, he learned that plaintiff had signed an affidavit in

the Dryden litigation.  Doc.#186-5 at 104.  On May 10, 2012, Peter Maharry, the City's attorney,

sent a copy of the affidavit to Scheibler.  Scheibler told Maharry that he was concerned about Helget

having signed the affidavit and that Helget was listed as a potential witness for Dryden.

On May 10, 2012, Erin Giebler, the City's Human Resources Coordinator, sent a copy of the

affidavit to Assistant City Manager Paul Briseno and wrote that

Policy H - 5(aa) states that an employee can be disciplined for:

Discussing with unauthorized  persons any confidential information
gained through employment with the City.

And Policy H - 7(o) states that an employee can be terminated for:

Disclosing confidential records or information unless directed to do
so by a department head or supervisor.

The question is, was she required to fill out this affidavit or just requested to (I do not
know [how] affidavits work . . . I asked [Scheibler] that question, he hasn't got back
to me yet.)

If she was required I don't feel like we can discipline.  If it was a volunteer thing I
feel like, at the very least, she violated H-5(aa).

> She seems like she is someone who would also sue us if she felt like she was let go improperly. Maybe this is something we need to discuss with John Bird before making a final decision as I don't know how it would look from a legal standpoint letting someone go because they provided a statement against the employer during a lawsuit.

Doc. # 182-4.  In response, Briseno wrote:

> That was going to be my recommendation. Were [sic] hanging out to [sic] much. Can you and [Scheibler] set up a meeting with [John Bird, the City's attorney,] to get his advice. Might also need an outside opinion but [Bird] can make that call.

Doc. #182-4 at 2.

> In response, Giebler wrote an email to Briseno which stated that:

> I just talked with [Scheibler] and he would like to do it on Tuesday so on Monday he can hopefully have [Helget's] Written Reprimand done and given to [Dougherty] about all the previous issues that [Scheibler] has brought up to see what discipline [Dougherty] wants to give Firma for that.

Doc. #182-4 at 1.

> Later on May 10, 2012, Giebler sent Bird, the City's attorney, an email which stated as

follows:

> Here is the affidavit Firma filled out. Firma is aware [] Chief Scheibler knows that she filled this out. What we want to know is if legally we can discipline or terminate her for this. As we stated on the phone this is not the only issue we are having with Firma and Chief Scheibler is already in the process of preparing a written reprimand for her over non-work related computer use and her poor attitude.

Doc. #182-5 at 1 (Dryden Affidavit attached to email; email copied to Dougherty and Scheibler).

> Briseno then wrote an email to City Manager Dougherty, which stated

> We talked to [Bird] at 4 and he will review and give us a recommendation[] as he believes we need to be cautious.

Doc. #182-6.[6]

---

[6]     On May 11, 2012, Scheibler sent Giebler a text message, apparently joking about
(continued...)

Scheibler later testified that after he learned of the affidavit, he did not trust Helget.  He testified that  "I think she intentionally took that confidential information and released it, uh, just deteriorating any hope for any trust between the person that she was supposed to help run the police department."  Id. at 162-63.  See Doc. #33-4 (affidavit contains "confidential information Plaintiff obtained due to her position with the City of Hays Police Department"); Dougherty Dep. at 67 ("[T]he information is such that she could only get it through her employment at the City of Hays Police Department."); Scheibler Memo, Doc. #107 ("It is my opinion that she has released information that could only have been obtained through her job as the Admin Sec.").  After May 10, however, Assistant Chief Dawson was still giving Helget projects that involved confidentiality.

Scheibler testified that on May 11, 2012, he met with City Manager Dougherty, HR Manager Giebler and Assistant City Manager Briseno.  Scheibler testified that at that meeting he decided to recommend that the City fire Helget.  He testified that participants discussed his recommendation, and that they "were all on the same page."  Doc. #198-4 at 72.  At that time, however, Scheibler had not given Dougherty a written recommendation.

On May 14, 2012, Scheibler wrote a memo to Dougherty recommending that the City fire Helmet for several reasons, including (1) lack of communication and interaction with the command staff; (2) negative/rude interaction with administration; (3) violating City policy for use of the internet; and (4) disclosing confidential City information in the Dryden affidavit.[7]  Doc. #107. Scheibler's memo specifically stated: "It is my belief that the majority of the affidavit contains

---

[6](...continued)
who was going to replace Helget.

[7]     After the City fired plaintiff, Scheibler created a timeline of the events which he later corrected to reflect errors in the dates.

confidential information that [Helget] could have only obtained through the course of her employment as the Administrative Secretary for the Hays Police Department.  Section H - 7(o) of the City of Hays Personnel Manual says that an employee may not disclose confidential records or information unless directed to do so by a department head or supervisor.  Assistant Chief Brian Dawson and I are [Helget's] supervisors and we did not direct her or give her permission to release the information in the affidavit."  Doc. #107.  Chief Scheibler's recommendation states in part, "[Helget's] actions and job performance leave[] no choice but to recommend that she be immediately terminated."  Id.

On May 16, 2012, Scheibler and Dawson met with plaintiff.  According to plaintiff, Scheibler told her that "it hasn't been working" since 2001, that plaintiff had breached confidentiality and that she "was moving on, so the City was moving on."[8]  Helget Dep. at 102; see Doc. #182-2 at 23. Scheibler informed plaintiff that she was being terminated because of a "recent issue with the release of confidential information."  Plaintiff understood that Scheibler's comment about breaching confidentiality referred to the information in the Dryden affidavit.  Ex. C, Helget Dep. at 106.

After he fired Helget, Scheibler prepared a timeline of the events surrounding her termination.[9]  Doc. #182-14.  The timeline indicates that on May 16, 2012 – when Scheibler informed Helget that she was terminated – she told him that when she completed the affidavit,

---

[8]     At the meeting on May 16, Scheibler's statement that Helget "was moving on" referred to the FHSU position which Helget had indicated she was pursuing.  In response, plaintiff told Scheibler that she had "turned it down." Ex. C, Helget Dep. at 102-103. Plaintiff later testified that when she said that she had "turned it down," she meant she was no longer pursuing the university position.  Id.

[9]     After Helget's deposition, Scheibler made numerous corrections to the timeline.

Dryden already knew the information.[10]  Id. at 2.  Scheibler wrote:

> I did not ask her how she knew that or how Dryden knew about a conversation between her and the Assistant Chief of Police.  I spoke with (former) Chief Jim Braun & [Assistant Chief] Philip Hartsfield and both denied giving [Helget] permission to release the information in the affidavit.

Id.  Plaintiff points out that Hartsfield testified under oath that Scheibler never asked him whether he gave Helget permission to release the information in the affidavit.  Doc. #182-15 at 18-21.

On May 17, 2014, Helget requested copies of her personnel file.  Giebler sent Scheibler an email which stated as follows:

> Firma just called Jamie asking for copies of her personnel file.  I told Jamie to tell Firma that she can come to the office and look through her personnel file but we do not make copies.  Don you need to get any other stuff you want included in the personnel file in there.

Doc. #182-9 at 1.  The IT staff then gave Scheibler access to Helget's e-mail account and computer contents, and Scheibler printed some email messages to and from Helget's account which concerned non-business topics.  Doc. #182-10 at 3.  Scheibler agreed that the kinds of emails that he printed were "relatively common place" around the police department and that they were not the basis for firing Helget.  Id.

Scheibler also asked Patty Wolf and Assistant Chief Dawson to write documents to place in Helget's personnel file.  Id. at 3-4.  Wolf was a City employee who had worked with Helget for 22 years.  Wolf and Helget had a difficult relationship.  Wolf later testified that she thought that the

---

[10]     Scheibler testified that it did not matter to him if Dryden already knew the information in the affidavit "because – just because somebody knows something doesn't make it not confidential anymore."  Scheibler Dep. at 84.  Scheibler also testified that if a supervisor retaliates against a police officer for union membership, he did not really know whether that information would be considered confidential.  Id. at 86.

City fired Helget in part because Helget could not get along with Wolf.[11]  Wolf testified that she assumed that she was being asked to write a letter for Helget's personnel file "to protect the City." Doc. #182-11.

After the City fired Helget, Dawson completed a form titled "City Of Hays Exit Informational Record."  In response to the question whether he would recommend her for rehire, Dawson marked "no."  In response to "why," he wrote "[c]ommunicated poorly, had trust and confidentiality issues, used internet computer to browse and make personal purchases on City time. Would be rude at times."  In response to "Your understanding of why employee is leaving," he stated "Terminated."  Below that, he added "On 5-9-12 Firma informed the Chief & Asst. Chief that she was taking a job with FHSU and would start with them in July."[12]

Dawson testified that Helget had achieved above-average marks in her previous performance review.  Id. at 60.  Helget received high marks in every category on her 2011 performance evaluation.  Ex. O.  Scheibler approved and signed that performance review.  Plaintiff's Ex. C.

On May 24, 2012, Human Resources Manager Giebler stated under oath to the Kansas Department of Labor ("DOL") that the "final incident that led to claimant's discharge" was an "excessive use of internet during work hours" and that Helget was "let go due to violating the City

---

[11]     Scheibler testified that he knew that Wolf and Helget did not get along.  Doc. #182-10 at 3-5.

[12]     Helget asserts that Dawson's response to the form indicated that Helget was fired because she was taking a job with FHSU, and that at his deposition Dawson admitted that this response was false.  Plaintiff's attorney asked Dawson "Would you agree that that's not the reason Firma was told she was being fired" and Dawson replied, "yes."  Dawson said that he believed that the question was intended to elicit the reasons for leaving.  See Doc. #182-3 at 2.  Plaintiff points out that when asked who told him the reasons that Helget was being fired, Dawson stated "Well, I was aware of them just from being her supervisor.  Um, as far as the, um -- who told me the *official* reasons?"  Doc. #182-3 at 2 (emphasis added).  Plaintiff asserts that Dawson's answer demonstrates that there was a difference between the "official" reason that the City fired her and the actual reason.

of Hays' internet usage policy and her lack of communication and interaction with the command staff." Docs. #182-2, 182-8, 182-16. Further, in the DOL statement, in response to the question "what policy was violated," Giebler did not state that Helget had violated the two sections of the Hays Personnel Manual that prohibit disclosure of confidential information. Docs. #182-8, 182-16. The DOL found that the evidence was "insufficient to establish [Helget's] conduct was a violation of a duty or obligation reasonably owed the employer as a condition of employment." Doc. #182-17.   In October of 2013, in response to a proposed policy for use of iPads by dispatchers, Giebler suggested to Briseno and Dougherty that the City allow dispatchers to view social media sites but not to post. She noted that "it will be hard to track if they do [post], but that "it is a nice catch all so if we do find out they posted something while at work especially something confidential or bad about the city or their co-workers, it is easier to discipline them." Doc. #182-18.

## Analysis

### I.      First Amendment Retaliation Claims

Plaintiff contends that defendants violated her First Amendment right to testify truthfully and to speak out on a matter of public concern when they fired her in retaliation for giving testimony in the Dryden affidavit.[13] The City of Hays and the individual defendants assert that they are entitled to summary judgment because plaintiff cannot establish that defendants violated her First Amendment free speech rights. The individual defendants assert that even if plaintiff can show a

---

[13]      The Pretrial Order sets out the First Amendment claim in two counts: retaliation for exercising plaintiff's First Amendment right (1) to testify truthfully (Count I) and (2) to speak out on a matter of public concern (Count II). See Pretrial Order (Doc. #171) at 7. Based on the law set forth below, Counts I and II are essentially different ways of characterizing the same claim – that the City fired plaintiff in retaliation for her testimony in the Dryden affidavit, which contained speech protected by the First Amendment. In other words, these two claims appear to be part of a single over-arching First Amendment free speech retaliation claim, and the Court treats them as such.

constitutional violation, they are entitled to qualified immunity because the right was not clearly established when they fired her.  Because the issue whether defendants violated plaintiff's First Amendment free speech rights is common to all defendants, the Court addresses this question first.

When considering a speech retaliation claim, the Court applies the Garcetti/Pickering test to determine whether the employee has established a prima facie case.  Eisenhour v. Weber Cnt'y, 744 F.3d 1220, 1227-28 (10th Cir. 2014) (citing Dixon v. Kirkpatrick, 553 F.3d 1294, 1301-02 (10th Cir. 2009)); see Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Pickering v. Bd. of Educ. of Topeka High Sch. Dist., 391 U.S. 563 (1968).  The five-part test requires the Court to examine the following issues:

1. Did the employee speak pursuant to his or her official duties?  If so, the speech is unprotected and the inquiry ends.

2. If the employee did not speak pursuant to his or her official duties, did the speech in question involve a matter of public concern?  If not, the speech is unprotected and the inquiry ends.

3. If the speech involved a matter of public concern, does the employee's interest in the expression outweigh the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace?  If not, the speech is unprotected and the inquiry ends.

4. If the employee's interest outweighs that of the employer, was the employee's speech a substantial factor driving the challenged employment action?  If not, the inquiry ends.

5. If the employee shows that speech was a motivating factor, can the employer show that it would have taken the same employment action against the employee absent the protected speech?  If so, plaintiff is not entitled to constitutional protection.

Allen v. Kline, 507 F. Supp.2d 1150, 1168 (D.Kan. 2007) (citing Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1201-03 (10th Cir. 2007).  The first three parts of the test are questions of law for the Court, while the final two issues are ordinarily for the trier of fact.  See id.

In their motions for summary judgment, defendants do not assert that plaintiff produced the affidavit as part of her official duties.[14]  See Lane v. Franks, 134 S. Ct. 2369, 2378 (2014) (truthful testimony under oath by public employee outside scope of employee's ordinary job duties is speech as citizen even if testimony relates to information learned during employment).  Defendants focus on the second and third issues, arguing that the statements in the Dryden affidavit did not involve a matter of public concern and that even if they did, the City's interests in regulating the speech outweigh plaintiff's interest in the expression.  Defendants concede the fourth issue – that the speech was a motivating factor in the decision to terminate plaintiff's employment.  As to the fifth issue, defendants argue that they would have terminated plaintiff's employment in the absence of her speech.

### Matter of Public Concern

Defendants contend that Dryden affidavit did not involve matters of public concern and therefore is not protected speech under the First Amendment.

To decide whether speech is constitutionally protected, courts ask whether it relates to a matter of public concern (which is protected) or a matter of purely personal interest (which is not protected).  Eisenhour, 744 F.3d at 1228 (citing Wulf v. City of Wichita, 883 F.2d 842, 856-57 (10th Cir. 1989)).  Speech involves matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of

---

[14]      The City sets out the four-part test of Pickering, supra.  See Doc. #186 at 16.  In Garcetti, 547 U.S. 410 (2006), the Supreme Court added a threshold inquiry of whether the employee spoke pursuant to official duties.  547 U.S. at 418-421.  As defendants concede, however, here plaintiff was not speaking pursuant to her ordinary job duties when she completed the Dryden Affidavit, and thus the first part of the revised Pickering-Garcetti test is not at issue.  See Memorandum Of Law In Support Of Individual Defendants' Motion For Summary Judgment (Doc. #179) filed October 27, 2014, at 16 n.2.

legitimate news interest; that is, a subject of general interest and of value and concern to the public." Lane, 134 S. Ct. at 2380 (quoting Snyder v. Phelps, 562 U.S. ——, ——, 131 S. Ct. 1207, 1216 (2011)).

The analysis involves scrutinizing the speaker's motivation: "Was the speech calculated to redress personal grievances or did it have some broader public purpose?" Eisenhour, 744 F.3d at 1228 (citing Starrett v. Wadley, 876 F.2d 808, 816 (10th Cir. 1989)).  Speech involves a public concern when the speaker intends to "bring to light actual or potential wrongdoing or breach of public trust" by a public official or to disclose any evidence of corruption, impropriety, or other malfeasance within a governmental entity. Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988) (quoting Connick v. Myers, 461 U.S. 138, 148 (1983)).  To evaluate whether speech concerns the public, the Court examines "the content, form, and context of a given statement, as revealed by the whole record." Eisenhour, 744 F.3d at 1228 (quoting Connick 461 U.S. at 147-48).  The speech must not merely relate generally to a subject matter that is of public interest, but must "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." Schrier v. Univ. of Colo., 427 F.3d 1253, 1263 (10th Cir. 2005) (quoting Wilson v. City of Littleton, Colo., 732 F.2d 765, 768 (10th Cir. 1984)).  Thus, the Court looks beyond the general topic of the speech to evaluate more specifically what plaintiff said on the topic. Schrier v. Univ. of Colo., 427 F.3d 1253, 1263 (10th Cir. 2005) (quoting Moore v. City of Wynnewood, 57 F.3d 924, 932 (10th Cir. 1995)); see Allen, 507 F. Supp.2d at 1169.

Here, plaintiff voluntarily completed a sworn affidavit which Dryden, her former co-worker, then filed in support of his lawsuit against the City.  Dryden's lawsuit claimed that the City had fired him in retaliation for union activities.  Defendants contend that none of the statements in the Dryden affidavit contain speech on matters of public concern.  Consistent with the framework set out above,

-16-

the Court analyzes the content, form and context of the speech at issue, as revealed by the whole record.  Connick, 461 U.S at 147-48.

As to content, defendants assert that the statements about the ballistic vest did not disclose any wrongdoing or malfeasance by the City or its officials.  See Oleynikova v. Bicha, 453 F. App'x 768, 773-74 (10th Cir. 2011) (crux of public concern inquiry is what is actually said on topic). Plaintiff states that she followed the Assistant Police Chief's instructions to order a ballistic vest for each officer on the list except for Blaine Dryden.  She does not state why the Assistant Chief took Dryden off the list.  Plaintiff later testified that she believed that the affidavit revealed wrongdoing because in all of her years at the Police Department, she had never had an officer removed from the vest replacement list.  She also testified, however, that she did not know why Dryden was taken off the list and did not know whether the City had a legitimate reason to do so.  The Court finds that Helget's speech about the ballistic vest does not appear calculated to disclose wrongdoing.  See Thayer v. City of Holton, 515 F. Supp.2d 1198, 1206 (D. Kan. 2007) (must show that speech was effort to educate or inform general public regarding police matter).  Cf. Wulf, 883 F.2d at 857 (letter which alleged unlawful interference with right to belong to union was speech on matter of public concern).

The Dryden affidavit also states that plaintiff and others in the Police Department knew that Dryden was an active member of the FOP who advocated for other employees and that when plaintiff pursued a grievance against the Department, then-Police Chief Braun cautioned her about talking with Dryden.  Again, these statements do not in themselves disclose wrongdoing on the part of the City or its officials.[15]

---

[15]    Finally, the Dryden affidavit states that it was common for Police Department
(continued...)

Plaintiff argues that in a broader context, her affidavit addressed a matter of public concern because it confirmed facts for Dryden to prove that the City had retaliated against him for union activity.  Specifically, she asserts that her affidavit supported Dryden's contention that the City had decided to fire him before the date of the incident which the City claimed was the reason it fired him.  Doc. #198 at 18-20; Plaintiff's Reply To Defendants' Joint Opposition To Plaintiff's Motion For Summary Judgment (Doc. #204) filed December 1, 2014, at 22.  Plaintiff argues that given the context of Dryden's lawsuit, her affidavit contained speech which exposed anti-union behavior and therefore involved a matter of public concern.  See Wulf, 883 F.2d at 857 (city fired police officer after he wrote letter to Attorney General discussing anti-union behavior by police administrators; letter contained speech on matter of public concern).

Plaintiff also asserts that because her speech took the form of a sworn affidavit prepared to support a former coworker's lawsuit, it is per se speech on a matter of public concern entitled to First Amendment protection.  She notes that in Lane v. Franks, the Supreme Court held that a public employee's truthful testimony, under subpoena at a trial of a City employee for fraud and theft, was speech on a matter of public concern.  In Lane the Supreme Court reasoned as follows:

> The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern.  See, e.g., Garcetti, 547 U.S., at 425, 126 S. Ct. 1951 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance").  And the form and context of the speech—sworn testimony in a judicial proceeding—fortify that conclusion.  "Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of

---

[15](...continued)
employees to talk about how much longer they had to work before becoming eligible for retirement, and that Helget heard Dryden and others talk about that.  The fact that Department employees discussed their anticipated retirement dates is not evidence of inefficiency or wrongdoing.

others."

134 S.Ct. at 2380 (quoting <u>United States v. Alvarez</u>, 132 S. Ct. 2537, 2546 (2012)).  Thus, although

<u>Lane</u> rests in part on the *content* of the speech, the Court found that the fact that the speech was

sworn testimony in a judicial proceeding bolstered the finding that the speech was on a matter of

public concern.[16]

---

[16]     In <u>Karl v. City of Mountlake</u>, the Ninth Circuit found as follows:

First, an employee's testimony may be a matter of public concern if its specific content exposes government wrongdoing or helps the public evaluate the performance of public agencies, irrespective of the nature of the judicial or administrative proceeding in which the testimony is offered.  <u>Alpha Energy Savers, Inc., v. Hansen</u>,  381 F.3d [917,] 927 [9th Cir. 2004]; <u>cf.</u> <u>Thomas v. City of Beaverton</u>, 379 F.3d 802, 809 (9th Cir. 2004) (holding that a public employee's expressive conduct in support of a co-worker in her personnel dispute was a matter of public concern because it helped expose potential government misconduct).  Alternatively, an employee's testimony may be a matter of public concern "if it contributes in some way to the resolution of a judicial or administrative proceeding in which discrimination or other significant government misconduct is at issue — even if the speech itself would not otherwise meet the <u>Connick</u> test were we to consider it in isolation."  <u>Alpha Energy Savers</u>, 381 F.3d at 927; <u>see</u> <u>Robinson [v. York</u>], 566 F.3d [817,] 823 (9th Cir. 2009) (police sergeant's testimony in a class action discrimination lawsuit addressed a matter of public concern, regardless of the specific content of the testimony or its impact on the outcome of the suit).  Just as speech whose content exposes potential government misconduct is speech on a matter of public concern, so too is speech made in the context of litigation brought to expose such wrongful conduct.  <u>See</u> <u>Alpha Energy Savers</u>, 381 F.3d at 926-27.  "So long as either the public employee's testimony or the underlying lawsuit meets the public concern test, the employees may, in accord with <u>Connick</u>, be afforded constitutional protection against any retaliation that results."  <u>Id.</u> at 927.

<u>Karl</u>, 678 F.3d 1062, 1069 & n.2 (9th Cir. 2012) (declining to decide whether public employee's testimony is per se a matter of public concern regardless of content or type of proceeding in which it is offered, noting that testimony was in response to subpoena).  The Third Circuit has addressed in-court testimony as follows:

Many courts of appeals have joined this court and the Court of Appeals for the Fifth Circuit in recognizing the fundamental role in-court testimony plays in our society and its importance to the question whether a public employee's speech is protected

(continued...)

The Tenth Circuit has recognized that "a witness's sworn testimony in a court proceeding is entitled to heightened protection under the First Amendment." Lytle v. City of Haysville, 138 F.3d 857, 864 n.2 (10th Cir. 1998); see also Worrell v. Henry, 219 F.3d 1197, 1204-05 (10th Cir. 2000). The Tenth Circuit has not directly addressed whether to apply a per se rule to trial testimony, stating as follows:

> There is a debate on whether trial testimony is per se a matter of public concern. This circuit's precedents have not explicitly adopted a per se rule. Other circuits are split. Some hold that any trial testimony is a matter of public concern. See, e.g., Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1578 (5th Cir. 1989) ("When an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern."); Latessa v. N.J. Racing Comm'n, 113 F.3d 1313, 1319 (3d Cir. 1997) (same). Some have not gone so far. See, e.g., Wright v. Ill. Dept. of Children & Family Servs., 40 F.3d 1492, 1505 (7th Cir. 1994); Padilla v. S. Harrison R-II Sch. Dist., 181 F.3d 992, 996-97 (8th Cir. 1999). We do not enter the debate, because Mr. Deutsch has not

---

[16](...continued)
by the First Amendment. See, e.g., Herts v. Smith, 345 F.3d 581, 586 (8th Cir. 2003) ("Subpoenaed testimony on a matter of public concern in ongoing litigation . . . can hardly be characterized as defeating the interests of the state. . . . Dr. Herts's speech therefore qualifies as protected speech."); Catletti ex rel. Estate of Catletti v. Rampe, 334 F.3d 225, 229-30 (2d Cir. 2003) ("In this case the context of Catletti's speech — testimony offered at a trial — is significant. . . . The paramount importance of judicial truth-seeking means that truthful trial testimony is almost always of public concern."); Worrell v. Henry, 219 F.3d 1197, 1204-05 (10th Cir. 2000) ( "[T]ruthful testimony is protected by the First Amendment and . . . a government employee may not be fired or subjected to other adverse action as a result of such testimony."); Wright v. Ill. Dep't of Children & Family Servs., 40 F.3d 1492, 1505 (7th Cir. 1994) (holding that "an employee summoned to give sworn testimony . . . has a compelling interest in testifying truthfully and the government employer can have an offsetting interest in preventing her from doing so only in the rarest of cases"); cf. Robinson v. Balog, 160 F.3d 183, 189 (4th Cir. 1998) ("By responding to the Board's invitation to testify at a public hearing and by cooperating with law enforcement investigators, Robinson and Marc spoke not in their capacity as . . . public employee[s], but as citizen[s] upon matters of public concern.") (citations and internal quotation marks omitted).

Reilly v. City of Atl. City, 532 F.3d 216, 230 (3rd Cir. 2008).

argued the point and we affirm on the public-concern issue in any event.

Deutsch v. Jordan, 618 F.3d 1093, 1100, n.1 (10th Cir. 2010).  Here, rather than trial testimony, plaintiff's speech was in the form of a voluntary sworn statement in support of a co-worker's retaliation case.  The parties do not point to – and the Court has not found – Tenth Circuit cases which directly address whether a sworn affidavit in support of a coworker's civil lawsuit per se raises a matter of public concern.  Cf. Foster v. Thompson, No. 05-cv-305-TCK-FHM, 2008 WL 4682264, at *10 (N.D. Okla. Oct. 21, 2008) (fact that plaintiff's testimony was compelled by subpoena supports finding that speech not calculated to redress personal grievances); Hook v. Regents of Univ. of Cal., 576 F. Supp.2d 1223, 1232 (D.N.M. 2008) (witness's testimony regarding misuse of public funds lends support to finding of public concern).

Here, standing in isolation, the content of plaintiff's speech may not have raised a matter of public concern.  Combined with the form and context, however, it is a close question whether plaintiff's affidavit constitutes speech on a matter of public concern.  Cf. Lucero v. N. Mex. Lottery, 685 F. Supp.2d 1165, 1177-78 (D.N.M. 2009) (plaintiffs submitted affidavits to support former colleague's wrongful termination suit, not to report wrongdoing; plaintiffs did not share affidavits with media or government officials so affidavits appear closer to speech pertaining to "internal personnel disputes" than speech raising "concerns in a manner reasonably calculated to compel . . . compliance with the law") (citing Baca v. Sklar, 398 F.3d 1210, 1220 (10th Cir. 2005).  The Court therefore assumes, without deciding, that plaintiff's speech was on a matter of public concern.

### *Pickering Balancing*

Assuming that the affidavit contained speech on a matter of public concern, the Court applies the Pickering balancing test.  Under Pickering, if an employee speaks as a citizen on a matter of public concern, the next question is whether the government had an adequate justification for its

action based on the government's needs as an employer.  Lane, 134 S. Ct. at 2380 (citing Garcetti, 547 U.S. at 418).  An employee's free speech interest may be outweighed by the public employer's interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.  Flanagan v. Munger, 890 F.2d 1557, 1566 (10th Cir. 1989).

When performing this balancing test, the Court does not consider the statement in a vacuum; rather, the Court examines the manner, time and place of the employee's expression as well as the context in which the dispute arose.  The Court considers whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.  Trant v. Oklahoma, 754 F.3d 1158, 1166 (10th Cir. 2014) (citing Rankin v. McPherson, 483 U.S. 378, 388 (1987)) (employer interest in regulating employee speech varies with extent of authority and public accountability that employee role entails).  The employer is not required to show that the speech *in fact* disrupted internal operations and employment relationships; it needs only to establish that the speech could potentially become so disruptive to operations as to outweigh plaintiff's interest in the speech. Trant, 754 F.3d at 1166 (citing Connick, 461 U.S. at 151-52).

The government's burden in justifying a particular employment action varies depending upon the nature of the employee's expression. Connick, 461 U.S. at 150.  The employer's burden to justify its restriction on speech increases in proportion to the value of that speech in the public debate. Curtis v. Okla. City Pub. Sch. Bd. of Educ., 147 F.3d 1200, 1213 (10th Cir. 1998).  Similarly, the burden of caution employees bear with respect to the words they speak varies with the extent of authority and public accountability in the employee's role.  Id.  "The employee's burden of caution

is greater when the employee serves in a 'confidential, policymaking, or public contact role,' rather than, for example, a clerical role, because of the higher likelihood the employee's speech will cause disruption to the agency's successful functioning." Id. (quoting Rankin, 483 U.S. at 390-91).

Here, plaintiff contends that her interest was in disclosing misconduct by the City. See Lytle, 138 F.3d at 865. She asserts that she believed that the affidavit revealed wrongdoing because the department had never removed an officer from the vest replacement list. This interest is weak – especially because plaintiff does not claim to know why the City made that decision. Plaintiff also asserts that the City failed to conduct a reasonable investigation into her speech to determine exactly what she said and whether it was confidential. Plaintiff correctly points out that an employer must determine what an employee said before asserting an interest in regulating that employee's speech. See Waters v. Churchill, 511 U.S. 661, 677-78 (1994) (plurality opinion). Here, however, plaintiff's speech was contained entirely in her affidavit. Thus, the investigation into what she said was complete upon a review of the two-page affidavit. Therefore, plaintiff's argument that the City failed to conduct a reasonable investigation is not persuasive.

Defendants assert that the City had a strong interest in maintaining trust among employees. Specifically, they note that as administrative secretary to the Chief of Police and Assistant Chief of Police, plaintiff was in a unique position which required assurance that she would not disclose confidential, sensitive or privileged information.[17] Defendants argue that plaintiff breached her duty to maintain confidential information while she was employed by the City, and that her direct supervisors therefore lost trust in her. See Melton v. City of Okla. City, 879 F.2d 706, 714 (10th Cir.

---

[17]    Defendants point out that even where a former employee knows confidential information, that does not allow a current employee to confirm or make public that confidential information. Further, even if the information was not confidential, voluntarily disclosing it certainly contributed to loss of trust.

1989) (in dicta, suggesting that breach of trust as result of trial testimony could possibly impair police department's workplace harmony so as to outweigh employee and public interest in truthful trial testimony); see Worrell, 219 F.3d at 1205 (public employee testimony may impair discipline by supervisors or harmony among coworkers, undermine close working relationships based on loyalty and confidence and impede performance of employee duties or regular operations) (citing Rankin 483 U.S. at 388); Lytle, 138 F.3d at 863-64.

The Tenth Circuit has acknowledged that "personal loyalty and confidence among employees are especially important in law enforcement." See Eaton v. Harsha, 505 F. Supp.2d 948, 965 (D. Kan. 2007) (citing Worrell, 219 F.3d at 1208). The Pickering balance often favors the employer when plaintiff's speech disrupts the harmony or working relationships in a law enforcement agency. Eaton, 505 F. Supp.2d at 965-66. Here, the record reflects that plaintiff's speech had a detrimental impact on the close working relationship between plaintiff and Scheibler for which personal loyalty and confidence were important. See Worrell, 291 F.3d at 1208.

Based on the entire record, the Court concludes that the balance of interest weighs in favor of effective and efficient law enforcement, and plaintiff has thus failed to meet the third prong of the Garcetti/Pickering test. Accordingly, plaintiff's speech is not entitled to First Amendment protection. The Court therefore finds that defendants' motions for summary judgment on Counts I and II should be sustained.

### *Qualified Immunity*

The individual defendants also argue that they are entitled to qualified immunity. To defeat qualified immunity, plaintiff must show that: (1) defendants violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged violation. Vondrak, 535 F.3d at 1204; see Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (citing Saucier

v. Katz, 533 U.S. 194, 201 (2001)).  Even if plaintiff had shown a constitutional violation under the first requirement, Scheibler and Dougherty would be entitled to qualified immunity under the second requirement.

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007); see Lobozzo v. Colo. Dep't of Corr., 429 F'Appx. 707, 710 (10th Cir. 2011) (unpublished)(clearly established right is right so thoroughly developed and consistently recognized under law of jurisdiction as to be "indisputable" and "unquestioned") (quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Here, when defendants fired plaintiff, the law was not clearly established that plaintiff's speech was a matter of public concern or than any public concern outweighed the employer's interest under the third prong of the Garcetti/Pickering balancing test.  See discussion, supra at 16-24; see also Lucero v. N. Mex. Lottery, 685 F. Supp.2d 1165, 1177-78 (D. N.M. 2009) (plaintiffs submitted affidavits to support former colleague's wrongful termination suit, not to report wrongdoing; plaintiffs did not share affidavits with media or government officials so affidavits did not raise public concern) (citing Baca v. Sklar, 398 F.3d 1210, 1220 (10th Cir. 2005)).  The individual defendants are thus entitled to qualified immunity on plaintiff's First Amendment

retaliation claim.

## II.   Conspiracy To Deprive Plaintiff of Her First Amendment Rights (Count III)

Plaintiff claims that defendants engaged in a conspiracy to violate her constitutional rights in violation of Section 1983. Pretrial Order (Doc. #171) at 7.  To establish a conspiracy claim under Section 1983 plaintiff must  show an agreement and an actual deprivation of a right secured by the Constitution and laws, 42 U.S.C. § 1983.  Dixon v. City of Lawton, 898 F.2d 1443, 1449 (10th Cir. 1990) (essence of Section 1983 claim is deprivation of the right rather than the conspiracy) see Thompson v. City of Lawrence, 58 F.3d 1511, 1517 (10th Cir. 1995) (to succeed on Section 1983 conspiracy claim, plaintiff must plead and prove both the existence of the conspiracy and deprivation of the constitutional right).   The Court has determined that plaintiff cannot show an actual deprivation of a constitutional right.  Defendants are therefore entitled to summary judgment on the conspiracy claim.

## III.   State Common Law Claims

Plaintiff also brings state law claims that defendants violated Kansas public policy when they terminated her employment for giving truthful testimony (Count IV) and for speaking out on a matter of public concern (Count V). Under 28 U.S.C. § 1367(c), the Court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction.  See Arbaugh v. Y & H Corp., 546 U .S. 500, 514 (2006).  The Court considers the nature and extent of pretrial proceedings, judicial economy, convenience and whether fairness would be served by retaining jurisdiction. Anglemyer v. Hamilton Cnty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  In the usual case, the balance of factors points toward declining to exercise jurisdiction over the remaining state law claims. McWilliams v. Jefferson Cnty., 463 F.3d 1113, 1118 (10th Cir. 2006) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988)).  Here, the Court finds no

compelling reasons to exercise supplemental jurisdiction to decide the merits of plaintiff's state law claims.  See Thatcher Enters. v. Cache Cnty. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990) (notions of comity and federalism demand that state court try its own lawsuits, absent compelling reasons to contrary); Holloman v. U.S.D. 259, No. 1180-JTM, 2006 WL 1675932, at *6 (D. Kan. June 15, 2006) (awarding summary judgment to defendant on Section 1983 claims and declining to exercise supplemental jurisdiction over state law claims).

**IT IS THEREFORE ORDERED** that the Individual Defendants' Motion For Summary Judgment (Doc. #178) and Defendant City Of Hays, Kansas' Motion For Summary Judgment (Doc. #185) filed October 27, 2014 be and hereby are **SUSTAINED** in part.  Defendants are entitled to summary judgment on plaintiff's claims under Section 1983 (Counts I, II, and III).

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Partial Summary Judgment (Doc. #181) filed October 27, 2014 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that plaintiff's state law claims (Counts IV and V) be and hereby are **DISMISSED WITHOUT PREJUDICE**.

Dated this 19th day of March, 2015 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge